**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

TOMAC,                                    :
                                          :
          Plaintiff,                      :
                                          :
     v.                                   : Civil Action No. 01-0398 (JR)
                                          :
GALE A. NORTON, Secretary, U.S.           :
Department of the Interior, *et*          :
*al.*,                                    :
                                          :
          Defendants.                     :

## MEMORANDUM

Plaintiff sues to prevent the Bureau of Indian Affairs from acquiring land in trust on behalf of the Pokagon Band of Potawatomi Indians.  The Bureau has now fully complied with the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 <u>et seq.</u>  The government's renewed for summary judgment will accordingly be granted.

## Background

This is the third opinion that I have issued in this case, which has been before me since 2001.  <u>See</u> <u>TOMAC v. Norton</u>, 193 F. Supp. 2d 182 (D.C.D. 2002) (<u>TOMAC I</u>); <u>TOMAC v. Norton</u>, 240 F. Supp. 2d 45 (D.C.D. 2003) (<u>TOMAC II</u>).  The facts of the case and its procedural history were set forth in those earlier decisions and will not be repeated in any detail here.

My decision in <u>TOMAC II</u> granted summary judgment for the government on all issues except one.  I found that the environmental assessment (EA) and related finding of no

significant impact (FONSI) performed by the Bureau of Indian Affairs had failed adequately to consider secondary impacts from growth and development associated with the casino the Pokagon will build on the property and remanded the case to the Bureau for further consideration of two related problems: 1) the original EA and FONSI did not sufficiently analyze the environmental impact associated with growth-induced development related to the casino; and 2) the original FONSI and EA failed adequately to explain <u>why</u> the development of such a large project (with 5,600 new jobs and a need for housing 800 new employees and their families in the immediate area) would not have a significant impact on a community of 4,600.

In August 2003, the Bureau issued a lengthy supplement to its EA, and in November 2003 it issued a revised FONSI.  The revised FONSI found that there would be no significant impact from growth, except for the increased demand for water and sewage services, which would tax the capacities of the current systems. That impact, the Bureau found, would be mitigated into insignificance by planned systems enhancements for which the Pokagon Band have agreed to provide partial funding.  The Bureau has now renewed its motion for summary judgment.  TOMAC opposes the motion on one procedural and numerous substantive grounds. The Pokagon Band (who assisted the Bureau in drafting the supplement to the EA) has filed briefs <u>amicus curiae</u>, which are

joined and supported by New Buffalo Township and the City of New Buffalo.

## Analysis

NEPA requires that agencies prepare environmental impact statements (EIS) for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). There is a two-step process to determine if an action has a "significant" impact. The agency initially performs an environmental assessment (EA). 40 C.F.R. § 1501.4. That assessment leads to a decision either to prepare a FONSI, or (if there will be significant effect[1]) to prepare a full EIS. Id.

A decision to issue a FONSI rather than prepare a full EIS is entitled to deference. "'Congress apparently was willing to depend primarily upon the agency's good faith determination as to what conduct would be sufficiently serious from an ecological standpoint to require use of the full-scale procedure.'" Public Citizen v. Nat'l Hwy. Traffic Safety Admin., 848 F.2d 256, 266

---

[1] Neither NEPA itself nor regulations issued under NEPA clearly define what constitutes a "significant" effect, but factors to be considered include the existence of beneficial as well as adverse effects, the degree of any adverse impact on endangered or threatened species, the degree to which effects are likely to be highly controversial or involve uncertain or unique risks, the degree to which the action may establish a precedent or represents a decision in principle about a future consideration, and the degree to which the action threatens a violation of any federal or state environmental requirements. 40 C.F.R. § 1508.27. Even an action that on balance will have beneficial effects may still cause a significant impact requiring a full EIS. Id.

(D.C. Cir. 1988) (quoting <u>Hanly v. Kleindienst</u>, 471 F.2d 823, 830 (2nd Cir. 1972)).  My role is to ensure that the Bureau has not ignored any "arguably significant consequences." <u>Public Citizen</u>, 848 F.2d at 266-67.  I may reverse the agency's decision only if it was "arbitrary, capricious or an abuse of discretion." <u>Sierra Club v. United States Dep't of Trans.</u>, 753 F.2d 120, 126 (D.C. Cir 1985).  I must carefully consider four factors in my analysis: (1) whether the agency identified the relevant areas of environmental concern; (2) whether it took a "hard look" at the environmental consequences of its proposed action; (3) whether it made a convincing case that the problems studied would have insignificant impacts; and, if an impact of significance was identified, (4) whether the agency established convincingly that changes in the project sufficiently minimized it.  <u>Sierra Club v. Peterson</u>, 717 F.2d 1409, 1413 (D.C.Cir. 1983).

**<u>Opportunity for Public Participation</u>**

TOMAC's procedural argument, that the Bureau should have submitted its 2003 EA supplement for public comment, is rejected.  The BIA decided not to do so, reasoning that "the supplemental assessment is essentially a response to public input (albeit through litigation but from a public party none the less)." AR4_168.  The BIA also thought it unlikely that further public comment would identify categories of effects not already explored.  <u>Id.</u>  There have been extensive opportunities for

formal and informal public comment in this case, <u>see</u> Amicus
Curiae Pokagon Band's Reply at 11 n.18., as well as numerous
public filings associated with four years of litigation
(including hundreds of pages of material from TOMAC addressing
the EA supplement and new FONSI).  FONSIs must be made available
for public <u>review</u>, 40 C.F.R. § 1501.4(e)(1), as was done here,
but there is no explicit statutory or regulatory requirement that
EAs be submitted for public <u>comment</u>.  <u>Fund For Animals v. Norton</u>,
281 F.Supp.2d 209, 225 (D.D.C. 2003).

## <u>Substantive Findings of No Significant Impact From Growth-Induced Development</u>

### <u>1. Local Zoning Restrictions</u>

It was not unreasonable for the BIA to conclude that
local zoning regulations will control growth-induced impact.  For
development done in the context of local zoning restrictions,

> cohesiveness of neighborhoods, population density,
> crime control, and esthetics . . . will be no greater
> than demanded by the residents acting through their
> elected representatives.  There is room for the
> contention, and there may even be a presumption, that
> such incremental impact on the environment as is
> attributable to [this use] is not 'significant.'

<u>Maryland-Nat'l Capitol Park and Planning Comm'n v. U.S. Postal
Serv.</u>, 487 F.2d 1029, 1036-37 (D.C. Cir. 1973); <u>see Sierra Club
v. Cavanaugh</u>, 447 F.Supp. 427, 432 (D.S.D. 1978) (finding no
significant impact where local zoning restrictions controlled
development that would result from new water system).  There are
cases noting that local authorities may be influenced by

political pressure to change zoning rules in ways that allow for
greater impact on the environment, see, e.g., CETAC v. Norton,
No. 02-1754, slip op. at 16 (D.D.C. Apr. 23, 2004); Mullin v.
Skinner, 756 F. Supp. 904, 921 (E.D.N.C. 1990), but those cases
only stand for the proposition that local planning documents may
not be "invoked in a perfunctory manner as the principal
justification for the EA's conclusions." CETAC at 14.  Here, in
any event, TOMAC points to only two pages of the 61-page EA
supplement as being inappropriately reliant on zoning, and
neither section cited could conceivably be considered a
"principal" justification for the FONSI.  See AR1_28,76.

### 2. Air Quality

The EA supplement and the new FONSI determined that
there would be no significant impact on air quality from growth-
induced development.  AR1_72-74, AR1_20.  Following the Clean Air
Act, 42 U.S.C. § 7401 et seq., the EPA established National
Ambient Air Quality Standards (NAAQS) for six "criteria
pollutants": carbon monoxide, ozone, lead, nitrogen oxide,
particulate matter, and sulfur dioxide. AR1_72.  See generally
American Trucking Ass'ns v. EPA, 283 F.3d 355 (D.C. Cir. 2002)
(providing background on NAAQS).  NAAQS may generally be relied
upon in an EA to determine if there will be a significant impact.
See Border Power Plant Working Group v. Department of Energy, 260
F.Supp.2d 997, 1020-21 (S.D. Cal. 2003).  At the time of

analysis, all criteria pollutants in the area met NAAQS. AR1_355. BIA's consultant determined that carbon monoxide was the most likely pollutant to impact air quality, and that if CO pollution would not exceed NAAQS, no other air pollutants would likely exceed them either. AR1_358. The consultant than ran projections for carbon monoxide pollution after anticipated growth-induced development and found that carbon monoxide levels would still meet NAAQSs. AR1_358-59, 361. Thus, no significant impact would occur for any of the criteria pollutants. AR1_363. BIA considered public comments on this precise issue in its initial EA, POKAG001_407, and I must defer to the agency's decisions. See Marsh v. Or. Natural Res. Council, 490 U.S. 360, 378 (1989)("[A]n agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive.").

BIA's analysis was executed during a time of transition for ozone standards. The EPA changed the NAAQS for ozone from a one-hour average of 0.12 ppm to an eight-hour average of 0.08 ppm in 1997. See generally American Trucking, 283 F.3d at 355 (providing extensive background on this decision). Those regulations were not implemented until April 30, 2004, at which time official decisions were published specifying which areas of the country were "in attainment" under the new standard. See id.

(describing litigation); 69 Fed. Reg. 23,858; 69 Fed. Reg. 23,951.  As of April 30, 2004, Berrien County, Michigan, where the casino has been sited, was considered to be in "nonattainment" under the new standard. 69 Fed. Reg. 23,910.  At the time the EA and FONSI were drafted, however, Berrien County was in attainment under then-current standards.  The BIA understood that the County would not be in attainment in the future, see, e.g., AR1_361 (acknowledging likely problem meeting new NAAQS, but indicating that new standard was not yet in effect), but relied on the standards in effect at the time.

The BIA was under a duty to file a supplemental EA if: "(I) The agency makes substantial changes in the proposed action that are relevant to environmental concerns; or (ii) There are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts," 40 C.F.R. § 1502.9(c)(1),[2] but supplementation "is only required where new information 'provides a seriously different picture of the environmental landscape.'" City of Olmsted Falls, OH v. FAA, 292 F.3d 261, 274 (D.C. Cir. 2002) (citation omitted; emphasis in original).  A decision not to supplement is subject to a "rule of reason," and is reviewed under the deferential arbitrary and capricious standard.  Marsh, 490 U.S. at 373, 377.

---

[2] The "EA supplement" that was filed in this case was a direct response to my order in TOMAC II and was thus not a "supplemental EA."

Further, "the initial decision whether [to supplement under NEPA] should be made by the agency, not by a reviewing court." Friends of the River v. FERC, 720 F.2d 93, 109 (D.C. Cir. 1983). Although agencies must "take a 'hard look' at the environmental effects of their planned action, even after a proposal has received initial approval," Marsh, 490 U.S. at 374, no formal NEPA documents must be produced to justify each decision not to supplement. Friends of the River, 720 F.2d at 109.

In this case, the BIA clearly considered the fact that Berrien County would likely not be in attainment under the new NAAQS. Should this happen, the BIA concluded, the new project would still have to comply with the Clean Air Act's requirements in such cases, including the possibility of undergoing a conformity analysis to guarantee compliance with state air quality goals. E.g., POKAG001_0407; POKAG001_0696. Furthermore, while insufficient without more to constitute a "hard look," the EA supplement did measure ozone precursor compounds. See Def.'s Reply at 15 n.10; AR1_391-92. Finally, in assessing the utility of analyzing ozone levels, the EA supplement notes:

> Ozone, hydrocarbons, and nitrogen oxide air quality concerns are regional in nature and as such meaningful evaluation on a project-by-project basis is not practical for these pollutants. Ozone close to ground level (tropospheric) can be transported long distances, under certain meteorological conditions, impacting air quality downwind of the area of formation. USEPA reports that most of the ozone in western Michigan is attributed to transportation from the upwind Gary-Chicago-Milwaukee severe ozone non-attainment areas.

> In fact, urban air shed modeling has demonstrated there
> is little to no change in ozone concentrations in
> western Michigan, even when VOC and NOx [ozone
> precursors] emissions are eliminated. (Federal
> Register, November 24, 2000).

AR1_361 (EA supplement air analysis).

BIA was not required to file a supplemental EA for air quality.  Its reliance upon standards in effect at the time of analysis was not unreasonable.  Especially in drawn-out cases such as this, reassessments must end at some point, or NEPA simply becomes a tool to stall new projects indefinitely, "render[ing] agency decisionmaking intractable, always awaiting updated information only to find the new information outdated by the time a decision is made."  Marsh, 490 U.S. at 373.

## 2. Impact of New Sewer and Water Systems

The EA supplement and new FONSI found that the growth-induced impact on the water and sewage systems would be significant.  Local authorities have plans to expand both services, however, and the Band has agreed to perform some of this work and fund additional portions of it.[3]  See AR1_54-57.

---

[3] Contrary to TOMAC's assertions, these obligations are sufficiently enforceable on both sides for NEPA purposes.  The Band can seek specific performance.  AR_227, 259.  Local authorities can seek compensation against "undistributed or Future Net Revenues" of the casino, although not the Band itself. AR1_228, 260.  In the unlikely case that the casino has no net revenue, there will be also be only limited growth-induced development. The two possible outcomes would thus be 1) no new infrastructure and no need for any new infrastructure; 2) no need for new infrastructure, but infrastructure that was built anyway at taxpayer expense.  Neither scenario produces significant environmental impact.

With the planned new infrastructure, environmental impact will be insignificant.  A mitigated FONSI such as this has long been appropriate under the laws of this Circuit.  See Cabinet Mountain Wilderness v. Peterson, 685 F.2d 678, 682-83 (D.C. Cir. 1982).  At least some of the new infrastructure will be built on existing utility sites, see, e.g., POKAG001_0425, and agreements with the Band require that work by the Band receive local permitting, thus mitigating construction impact, as discussed above.  See AR1_222, 255-56.  The new FONSI is not arbitrary and capricious as to water and sewer impact

### 3. Other Potential Impacts Considered

In addition to the issues discussed above, the EA supplement and new FONSI considered the possible impacts of growth-induced development in the following areas: housing, commercial development, transportation/traffic, public safety, solid waste, prime and unique farmland, storm water, groundwater, flood plain, wetlands, critical dunes and the Coastal Zone Management Act, wildlife, vegetation, cultural resources, noise, and ecosystem.  AR1_25.  No significant impact was found in any of these areas.  BIA asserts that the EA supplement is the most detailed investigation of indirect impacts that it has ever produced in an EA or an EIS.  AR1_30.  The EA supplement covers all of the topics that I listed in TOMAC II as being unaddressed, and then some.  See TOMAC II, 240 F. Supp. 2d at 50-53.

BIA has not ignored any areas of concern, it has taken a "hard look" at problems raised, and its assessments are not arbitrary or capricious.  The law requires no more.  In the area of housing growth, for example, BIA calculates that 673 new residential units in an area with a population of 4,600 would involve only a 3.6% average growth rate (with a peak of 7%) over 5 years, and would impact only one third of acreage reasonably available for housing in the area, which in turn was only a portion of the total land not developed.  <u>See</u> AR1_12-19, 165.  As for the commercial growth necessary to accommodate 5,600 new jobs and over 4 million visitors a year, BIA's demand modeling and economic projections show that new growth would be limited to one 100 unit hotel, three new restaurants, one new gas station/convenience store, and one new one-story multi-use commercial building.  AR1_44-48.  What constitutes "significant" impact is left primarily to BIA's discretion, <u>Public Citizen</u>, 848 F.2d at 266, and in housing, commercial growth, and other areas, I cannot say that BIA's analysis was arbitrary or capricious.[4]

### 4. Cumulative Impact

TOMAC argues that BIA ignores the "cumulative impact" of development from the casino -- that all of the various supposedly insignificant impacts "when added together" must be at

---

[4] The record does reflect a conflict between the opinions of TOMAC's experts and those of BIA and its consultants, <u>see</u> Pl.'s Reply Exs. E,F, but BIA is entitled to reasonably rely on its own experts, <u>Marsh</u>, 490 U.S. at 378, which it has done in this case.

least possibly significant. Pl.'s Reply at 33.  One component of significance under NEPA is:

> Whether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts.

40 C.F.R. § 1508.27(b)(7).  "Cumulative impact" is defined as:

> The impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

40 C.F.R. § 1508.7.  See Grand Canyon Trust v. FAA, 290 F.3d 339, 341-43 (D.C. Cir. 2002).  This definition does not include aggregated impacts from the same project (e.g., building homes, increasing traffic, cutting down trees), but rather aggregated similar impacts from different projects (those not included in the EA in question).  See Coalition on Sensible Transp. v. Dole, 826 F.2d 60, 70 n.9 (D.C. Cir. 1987).  A Tenth Circuit decision, Davis v. Minetta, 302 F.3d 1104, 1125-26, appears to take a different approach to "cumulative impact," but it does so without citation or analysis and is not controlling.  The new FONSI in any case does address "the cumulative effects of the indirect impacts" from the project itself, finding them "not significant when their collective impacts over time are considered."  AR1_20.

- 13 -

And it draws the clear (apparently unchallenged) conclusion that "no past, present or reasonably foreseeable future actions are known or anticipated which might produce a significant cumulative impact when considered with the added incremental impact of [the project]." Id. BIA has thus properly considered the issue of cumulative impact, and I cannot find its conclusions arbitrary or capricious.

## Conclusion

In 2003, I remanded this case to the BIA to consider the impact of growth-induced development on the environment. The BIA prepared a lengthy EA supplement and a new FONSI which considered just this issue. While I might not agree with BIA's conclusions in every area, its determinations are entitled to deference. Summary judgment will accordingly be granted to the defendant. An appropriate order accompanies this memorandum.


                              JAMES ROBERTSON
                         United States District Judge